Don C. Sylvester et als. *vs.* Abbott Worthley.

Aroostook.    Opinion December 18, 1922.

*If one of the parties to a contract request the other party to defer his performance of the conditions of the contract, and such other party acts upon such suggestion or request in good faith he is entitled to a corresponding extension of time beyond that specified in the contract, and if the party making such request by his own acts places the other party in a position where he is prevented from completing the contract within the specified time, he is estopped from setting up as a defense non-performance within the specified time.*

A fair interpretation of the contract placed upon the defendant the duty of notifying the plaintiffs when he desired the various shipments to be made, the names of the consignees and the route over which they should be billed. The plaintiffs could not load at their own option but must await the direction of the defendant.

If the defendant, during the correspondence between the parties as to the fulfilment of the contract, asked for delay in shipment, and the plaintiffs acted upon such suggestion and request in good faith, they should be allowed a corresponding extension beyond the end of the contract month.

If the defendant's own acts placed the plaintiffs in a position where they were prevented from completing the contract within the specified time, then he is estopped from setting up non-performance within that specified time as a defense.

The jury must have found from the evidence that the plaintiffs were excused from shipping the three cars on September 30th, and in the opinion of the court the verdict was clearly justified.

On defendant's motion for a new trial.    This is an action on account annexed to recover the contract price for six hundred ninety-six barrels of potatoes. On July 13, 1921, plaintiffs entered into a written contract with the defendant agreeing to sell and deliver to defendant during the month of September, 1921, twenty-five hundred barrels of potatoes in bulk at $4.50 per barrel, F. O. B. shipping point, defendant paying down $2500 at the time of the execution of the contract. On August 31, plaintiffs wired defendant that they were ready to commence shipping and asked for shipping instructions on one car. In his reply the defendant requested plaintiffs to defer for ten days the commencement of shipping, and also requested the

plaintiffs to sack the potatoes at his expense. On September 22, plaintiffs received shipping instructions for four cars, and on September 24, they received shipping instructions for the remainder of the 2500 barrels. Between September 24 and September 30 inclusive plaintiffs loaded eight cars, but the last remaining three carloads, to recover the contract price of which this action was brought, all the other carloads having been accepted and paid for, were loaded on October 1. The defendant denied liability on the ground that the plaintiffs were bound to load all the potatoes required under the contract within the month of September as required by the terms of their contract. The plaintiffs contended that by the delay in commencing to ship requested by defendant, and also the failure to seasonably give them shipping instructions, they were not able to procure cars and load all the potatoes within the month of September. The case was tried to a jury and a verdict for $1360.50 was rendered for plaintiff, and defendant filed a general motion for a new trial. Motion overruled.

The case is fully stated in the opinion.

*W. S. Brown,* for plaintiffs.

*Powers & Guild,* for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, PHILBROOK, MORRILL, DEASY, JJ.

MORRILL, J. Non-concurring.

CORNISH, C. J. Plaintiffs are potato dealers in the County of Aroostook, Maine; defendant a potato dealer in Red Bank, New Jersey. This action was brought to recover a balance alleged to be due on the sale and delivery of potatoes under a written contract, dated July 13, 1920. The portions of the contract essential to this discussion are these:

"The party of the first part sells and the party of the second part purchases twenty-five hundred barrels (165 pounds each) U. S. No. 1 Cobbler potatoes in bulk."

"And for said potatoes, party of the second part agrees to pay the sum of $4.50 per barrel F. O. B. shipping point."

"Party of the first part are to ship said potatoes during the month of September, 1920."

"The obligation of the party of the first part is contingent upon strikes, car shortage, embargoes, unavoidable accidents beyond their control."

At the time of execution of the contract the defendant made the agreed initial payment of $2500, being one dollar per barrel for the specified quantity. There is no controversy as to the quality. Eight carloads were shipped and paid for. The defendant rests his defense against payment for the three remaining cars upon the single ground that under the terms of the contract the plaintiffs were bound to ship the entire quantity within the month of September, and that they broke their contract because these last three cars were not loaded until October 1st and billed out on October 2d, a delay which he says was without legal excuse.

The plaintiffs reply is, that even assuming that time was of the essence of the contract, the brief delay of twenty-four or forty-eight hours was caused by the previous requests of the defendant himself and therefore the plaintiffs must be allowed additional time for completion equivalent to the time of requested delay. The jury returned a verdict for the plaintiffs in the sum of $1360.50, and the case is before the Law Court on defendant's general motion for a new trial.

It is evident that a fair interpretation of the contract placed upon the defendant the duty of notifying the plaintiffs when he desired the various shipments to be made, the name of the consignees and the route or routes over which they should be billed. His was the first move and this move must be made seasonably in order that the plaintiffs could have a reasonable time within which they could make the shipments. The parties themselves must have so understood it. The plaintiffs could not load at their own option but must await the direction of the defendant. If therefore the defendant during their correspondence as to fulfilment of the contract asked for delay in shipment during the earlier part or middle of September, and the plaintiffs acted upon such suggestion and request in good faith, they should in law as well as in justice and fair dealing be allowed a corresponding extension beyond the end of the month. *Moore* v. *Bond,* 18 Maine, 142, 145; *Frommel* v. *Foss,* 102 Maine, 176. *McGowan* v. *Am. Tan Bark Co.,* 121 U. S., 575. If the defendant's own acts placed the plaintiffs in a position where they were prevented from completing the contract within the specified time, then he is estopped

from setting up non-performance before that specified date as a defense. Moreover, the possibility of car shortage was incorporated in the contract as a contingency affecting the plaintiff's obligation. This did not necessarily mean a car shortage during the entire month of September; but if at the defendant's request the shipments were delayed into the latter part of the month and then a car shortage developed the plaintiffs should not be injured thereby. Such an unfair advantage should not be permitted.

Such being the general principles of law governing the issues involved here, what does the record show as to the conduct of the parties?

The plaintiffs were diligent and alert, ready to perform when called upon, and even took the initiative which they were not called upon to take.

On August 31, one day before shipments could begin, they wired the defendant "Will load car on contract last of this week if can get car. Wire billing." Instead of wiring billing the defendant answered on August 31st, "Letter mailed yesterday. Kindly delay few days. Potatoes green." The letter of August 30th referred to in defendant's telegram states that he had sold the potatoes in Atlanta, Georgia, and the purchasers had asked when he would begin shipment and it continues: "I am advising them today that I feel that they should wait for another week or ten days so that the stock will carry safely and that we will not have any trouble regarding the shipments." He then asks that the potatoes be sacked and concludes; "As you are on the ground floor and know the conditions in Maine much better than I do I will be guided by what you say in regard to the shipping of these cars at the present time, but from what I have heard it seems to me that we should delay the shipments as above stated."

The telegram and letter taken together constitute a plain request to delay shipment a week or ten days. Plaintiffs complied with this request. In fact they could do nothing else as they had received no billing orders. The contract gave them thirty days in which to ship. If a week or ten days were cut off at the beginning at defendant's request, then the plaintiffs were entitled to a week or ten days extension to compensate for it. At that time the defendant himself evidently took the same view because in his letter to the plaintiffs he said he had told the Atlanta parties that "we will not have any

trouble regarding the shipments." By "we" Sylvester and Worthley are meant. When he speaks of the Atlanta parties in this letter he refers to them as "they." His idea as expressed to the Atlanta parties was that if he should ask delay of the plaintiffs, they would undoubtedly grant it and the plaintiffs and defendant could arrange the matter amicably and justly. This of course was the plaintiffs' idea also.

At the end of the asked for period of delivery the defendant expresses for the first time a desire to be relieved of his contract. Possibly he may have had that intention when the letter of August 30 and the telegram of August 31 were sent, because there is no evidence showing how he could then have known whether the potatoes were green or not, and it is admitted that on September 30 the market price of these potatoes had fallen to $2.25 per barrel, one half the contract price. A falling market is apt to be the mother of excuses. However that may be, on September 9 he wired plaintiff, "What would be your best terms to settle on our contract and not ship the potatoes, hurry answer." Plaintiffs wired this answer on September 13th: "Telegram received. Do not want to cancel contract. We will store potatoes for you until December 1, &c. . . . . We are all ready to ship five cars this week. . . . . If you don't wish us to store give us billing for five cars not later than September 15. Hurry answer." Eleven cars carried the entire lot, so that five cars whose billings were asked for by the plaintiffs would carry practically one half the lot by half of September, thus keeping up with the requirements of the contract.

Instead of sending billings for these five cars the defendant delayed the plaintiffs still further. On September 14 he wired that the Atlanta parties would pay a small sum to cancel the contract. If not, then he asked the plaintiffs to sack the potatoes in ten-peck bags, to start loading them next week, and his representative would be in Westfield to arrange shipments the next Tuesday. Nearly three weeks of the month of September had then passed and the plaintiffs were still unable to obtain any directions for shipment. They were ready and willing to perform but were powerless to do so because of the defendant's failure to give the necessary instructions. And this attitude on the defendant's part continued. On September 19 the defendant wired the plaintiffs: "Our Mr. Stryker will arrive Westfield Monday morning do you think potatoes will carry to Atlanta,

Georgia? Please confer with Mr. Stryker your advice is needed and will be guided by your opinion." This is rather a significant telegram. Without any reason therefor the defendant was apparently hoping to find some defect in the quality of the potatoes warranting a cancellation of the contract on that ground. Otherwise there was no necessity of sending Stryker to Westfield. All that the plaintiffs needed were billing orders which could be sent by telegraph. The defendant's hope, however, was blasted. Stryker wired him after arrival at Westfield on September 20: "Have seen Don Sylvester's potatoes. Found them dry and O. K." No fault could be found with the quality. That defense faded away. Stryker added to his telegram the following: "Have found you can ship by rail to Boston, then by boat to Savannah for seventy cents per cwt. all rail dollar nineteen cwt. Wire Don Sylvester shipping instructions."

On the same day, September 20, defendant wired the plaintiffs, "Secure through rate via. Boston steamer Savannah to Atlanta, Georgia, quick." Plaintiffs secured the desired information and wired defendant on September 21, "Through rate via. Boston to Atlanta, Georgia, dollar fourteen hundred," a slightly less figure than that quoted by Stryker. Finally on September 21, after all this backing and filling, the defendant wired an order to ship four cars by all rail route to Atlanta. This was the first shipping order that defendant had sent. Only nine days in September then remained in which to ship the entire lot, all through the defendant's fault.

On September 23 the defendant wired plaintiffs to "make the contract into eleven cars around 225 barrels each," with shipping instructions for the other seven. Up to the time that these last two telegrams were received, Sylvester testifies that he had supposed from the nature of the previous inquires made by defendant that the shipments would be by rail to Boston and thence by water, and he had made provisions for cars to ship to Boston and connect with a water route South. They were to be lined cars. But such cars were not allowed by the railroad company to go south and therefore when the orders came for all rail shipments a change was necessitated, and plaintiffs proceeded to order from the Railroad Company eleven cars for all rail shipment South. Only seven of the required kind were in the yard at that time. There was a car shortage. The other four were ordered of the Railroad Company by the plaintiffs at once, viz., on September 24. The earliest date at which they could get a

car set at the potato-house door was September 25. The plaintiffs then proceeded to load with all due diligence, viz., two cars on 25th, (26th was Sunday) one car on 27th, one car on 28th, two cars on 29th, two cars on 30th, making eight, all that were available, and to accomplish this they worked overtime. Three other empty cars, to make up the required eleven, arrived in the railroad yard on the afternoon of September 30, but too late under the rules of the road to be set that day. They were set and loaded the next day, October 1, and billed out on October 2.

On the strength of this enforced delay of only twenty-four or forty-eight hours, of which delay the defendant himself was the cause, the defendant refused to pay for the three cars loaded on October 1.

Under presumably proper instructions from the presiding Justice as to the legal rights of the parties the jury found in favor of the plaintiffs, thereby finding under the evidence that the plaintiffs were excused from shipping those three cars on September 30. That verdict instead of being clearly wrong is in our opinion clearly right. The plaintiffs acted honestly and diligently from start to finish. They may have been a bit too credulous in acquiescing in every request made by the defendant, but they undoubtedly expected the same honesty of purpose on his part and were dealing with him in a spirit of absolute fairness. At his request they sacked the potatoes at the agreed price of 25 cents per sack, a process not required by the contract and one consuming a considerable amount of time. From the time they obtained the first billing order on September 21 they rushed the sacking and loading with all reasonable despatch, and to penalize them because of compliance with defendant's requests for delay is not permitted by the law. The case falls well within the doctrine of extension of contract time already considered, and the entry must be,

*Motion overruled.*